# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Michael L. Larkin

     v.                            Case No. 19-cv-102-LM

Strafford County Department
of Corrections Superintendent
Christopher Brackett et al.[1]

## REPORT AND RECOMMENDATION

Plaintiff, Michael L. Larkin, has filed a motion for a preliminary injunction (Doc. No. 12), seeking relief on claims challenging policies of the Strafford County Department of Corrections ("SCDOC") that he claims violate his First Amendment right to receive mail and Fourteenth Amendment procedural due process rights. The district judge referred that motion to the undersigned magistrate judge. The court heard testimony and received documentary evidence at an evidentiary hearing on the motion on October 28, 2019, at which Larkin appeared pro se and Attorney Christine Friedman appeared on behalf of the defendants.

---

[1]Defendants who have been served in this action are Strafford County Department of Corrections Superintendent Christopher Brackett and Strafford County. The remaining defendants named in Larkin's initial pleadings have been dropped as parties.

**Background**

I.    Claims & Relief Requested

The following claims arising under 42 U.S.C. § 1983 are

before the court on the motion for a preliminary injunction[2]:

> 1.    The SCDOC policy prohibiting inmates from receiving
> and possessing print copies of magazines and newspapers has
> violated Larkin's First Amendment rights.
>
> 2(a).   The SCDOC policy that prohibits inmates from
> receiving personal letters or photos through the mail has
> violated Larkin's First Amendment rights.
>
> 3.    The SCDOC policy or practice of not providing notice
> or an opportunity to be heard when letters addressed to
> inmates are withheld or not delivered, has deprived Larkin
> of procedural due process, in violation of the Fourteenth
> Amendment.

Larkin seeks the following types of preliminary relief on those

claims:  an order allowing him access to print publications, an

order allowing him access to personal mail and photos, and an

order mandating that he receive notice and an opportunity to be

heard when his incoming personal letters are returned or

destroyed.


II.   Evidence

A.    Policies Regarding Incoming Mail and Tablets

1.    General Ban on Personal Mail

---

[2]The claims at issue are substantially the same claims that
were served upon defendants.  Cf. June 10, 2019 Order (Doc. No.
20); June 10, 2019 Report and Recommendation ("R&R") (Doc. No.
19), approved by Sept. 25, 2019 Order (Doc. No. 40).

Superintendent Christopher Brackett and Security Captain
Robert Hayden testified that the SCDOC has concerns about the
health, safety, and security risks to inmates and SCDOC staff
that are raised when drugs like Suboxone, fentanyl, and
"designer drugs" like "K2" (a synthetic cannabinoid[3]) pass
undetected into the facility.  These concerns were heightened in
June 2017 when five SCDOC inmates overdosed on drugs that may
have come into the facility through the mail.  In response, the
SCDOC implemented policies generally prohibiting inmates from
handling and receiving the originals of any incoming privileged
mail, including letters from their attorneys, courts, and other
government officials, and generally banning the delivery of all
incoming personal mail to most SCDOC inmates.  Except for
Immigration and Customs Enforcement ("ICE") detainees housed at
the SCDOC, SCDOC inmates are no longer allowed to receive any
personal, non-privileged letters, cards, postcards, or photos
sent to them through the U.S. Mail.  See Stip. of Facts for
Evid. H'g of Oct. 28, 2019 (Doc. No. 50) ("Stip.") ¶¶ 10, 12;
see also July 18, 2004 SCDOC Inmate Handbook (rev. Dec. 3, 2018)
(Defs.' Ex. A) ("Inmate Handbook"), Incoming Mail ¶ 1, at 16.

Supt. Brackett testified that, when such letters and cards

---

[3]See NIH, Nat'l Inst. on Drug Abuse, Drug Facts: Synthetic
Cannabinoids (K2/Spice) (rev. Feb. 2018),
https://www.drugabuse.gov/publications/drugfacts/synthetic-
cannabinoids-k2spice (last accessed Nov. 25, 2019).

are received in the SCDOC mailroom, officers return those
letters and cards unopened to the sender, with a marking on the
outside of the envelope that states, "Return to Sender.
Personal Mail No Longer Allowed."  Inmates, however, receive no
notice when their incoming personal mail is returned to the
sender pursuant to that policy.  Stip. ¶ 15 (Doc. No. 50).

Capt. Hayden and Supt. Brackett both testified that prior
to implementing the mail ban, the facility had employed the
practice of visually screening all incoming mail for contraband,
rejecting mail with contraband, and delivering those items that
appeared not to contain contraband to the addressee inmate.
Both Capt. Hayden and Supt. Brackett further testified that
visual screening of incoming mail proved to be ineffective, as
inmates were still able to receive drugs through the mail.  Both
witnesses explained that some of the drugs that were coming into
the facility could be sprayed on the paper used to write
letters, or mixed with ink and printed on that paper, and could
then be ingested by the inmates, or the paper could be smoked,
which set off smoke alarms in the facility.  Capt. Hayden
further explained that some drugs, like suboxone, could be
melted with crayons, and then the wax mixture could be used to
decorate cards or draw pictures that could be sent to inmates,
who could then ingest the crayon-covered paper.  Capt. Hayden
testified that skillful applications of drugs to paper would not

4

necessarily leave a stain that could readily be identified by a visual screen.  Both witnesses further explained that SCDOC staff were concerned for the health and safety of SCDOC officers, as well as inmates receiving the mail, as handling paper treated with some of those drugs could lead to accidental toxic drug exposures or overdoses.  Those factors influenced the decision to ban inmates from receiving the originals of incoming mail as a means of reducing the amount of potentially hazardous contraband coming into the facility.

### 2.    Copy and Shred Policy

"Privileged Correspondence," including attorney letters addressed to inmates, court mail, and other mail from government agencies, as well as personal, nonprivileged letters sent to ICE detainees, are not subject to the general ban on incoming letters.  See Inmate Handbook, Privileged Correspondence ¶ 3, at 16.  Supt. Brackett testified that letters from attorneys and other incoming "privileged" letters are opened in the inmate's presence.  The originals are then copied and shredded, and the copies are provided to the inmate.

Supt. Brackett and Capt. Hayden further testified that all ICE mail is treated essentially like other inmates' privileged mail.  They testified that Strafford County's contract with ICE has been construed to require the SCDOC to deliver personal

letters to ICE detainees.  When asked if the SCDOC could
implement the copy-and-shred process for all incoming personal
letters, Supt. Brackett testified that, as there are about three
hundred SCDOC general population inmates subject to the personal
letter ban, and only about seventy-five ICE detainees at the
facility at a given time, the facility manages the resource
demands of implementing the copy-and-shred policy for its ICE
detainees better than it could if officers had to copy, shred,
and distribute copies of all personal letters addressed to every
inmate in the facility's general population.

### 3.    Inmate Tablet/Email Correspondence

All inmates in the SCDOC general population, upon intake,
are issued tablets through which they can exchange emails or
messages with family and friends and receive digital images and
short videos.  See Inmate Handbook, at 3 ("About the Inmate
Tablets").  Although the inmate does not pay a fee for the
tablet or for incoming emails or messages, a person wishing to
correspond with an inmate from outside the facility must first
set up and deposit funds in an account online through a third
party vendor website, to initiate the correspondence.  See id.

Superintendent Brackett testified that corresponding with
an SCDOC inmate through the tablet can be less costly and
quicker than regular mail.  The sender less than the cost of a

6

First Class stamp to send an electronic message or email to an
inmate, which covers the $0.25 charge to send the message to the
inmate and the $0.25 charge for a response.  See Stip. ¶ 11
(Doc. No. 50).  The Superintendent further testified that
inmates with tablets may receive new messages three times per
day, seven days per week, and that, allowing time for officers
to screen incoming messages for security threats, inmates are
typically able to open the electronic messages less than sixteen
hours after they were posted.  Once transmitted and released to
the inmate, the messages remain linked to the inmate's account,
and the inmate can reopen them multiple times.

4.  Notice Issues

At the October 28, 2019 hearing, the court heard testimony,
and exhibits were presented, on the ways in which the SCDOC
notifies inmates and the public about its inmate mail policies
and the availability of electronic communication through the
tablets.  The Inmate Handbook, distributed to every inmate at
intake, provides inmates with a description of those policies,
see Stip. ¶¶ 3-4, 9-10 (Doc. No. 50), which inmates can then
relay to their families and friends in a letter.  Supt. Brackett
testified that all inmates, including those without funds for
calls and stamps, can send out letters providing notice of the
mail policy and of the way in which they can receive electronic

7

messages or emails, as indigent inmates receive three stamped
envelopes every week that they can use for outgoing personal
mail.  Larkin testified that he sent out letters saying that he
could not receive letters back and that a family member could
set up an account for him to receive electronic messages.

Supt. Brackett testified that in 2017, after the tablets
had been first put into use and the restrictions on incoming
mail were first implemented, unopened envelopes were returned to
the sender inside a larger envelope containing a statement from
the Superintendent explaining the new policy.  At some point in
the last two years, the SCDOC stopped sending out that
explanation with each returned letter.  At present, people who
put their return address on letters sent to SCDOC inmates
receive notice of the personal letter ban in the form of a
message stamped on the outside of the envelope returned to them,
which states that the SCDOC no longer accepts personal letters
addressed to inmates.  Supt. Brackett testified that fewer
incoming letters addressed to inmates have been arriving at the
facility in the two years that have passed since the facility
first rolled out the use of tablets for electronic messages.

Supt. Brackett further testified that the SCDOC website has
published a notice regarding the ban and the steps that can be
taken to set up an account to start sending electronic messages
to SCDOC inmates.  Counsel demonstrated in the hearing that the

website still publishes information on the mail ban and on

emails.  At the time of the hearing, and presently, the

website's "Frequently Asked Questions" stated the following[4]:



Also, the website displays a box entitled "News," which

toggled between information about emails and an unrelated

matter.  The pertinent information states as follows[5]:

The hyperlink in that "News" notice connects to a third-party

---

[4]See SCDOC Frequently Asked Questions,
https://www.co.strafford.nh.us/frequently-asked-questions
(accessed Oct. 28, 2019 and Jan. 9, 2020).

[5]See SCDOC News,
https://www.co.strafford.nh.us/department/jail-doc-corrections
(accessed Oct. 28, 2019 and Jan. 9, 2020).

vendor website,[6] which provides additional information about the services available through the tablets at the SCDOC, and the steps to follow to fund an account allowing particular inmates to exchange messages with the person setting up the account and to receive videos and digital images through that account.

B.    Impact of SCDOC Mail Policy on Larkin

Larkin testified that since his arrival at the SCDOC, he has sent out several letters through the U.S. Mail without receiving replies.  Specifically, he sent two letters to a sister in Maine for whom he had two addresses, neither of which he is certain is current, and one letter to a drug treatment facility in Maine called "Milestone."  Larkin testified that he told Milestone in that letter that he would not be able to receive a letter back through the mail, but he did not tell Milestone how to reply electronically.  Larkin's letters to his sister stated that she could set up an account online to send him a message on his tablet.  Larkin testified that he has not spoken with his sister in thirty years and does not know if his letters reached her, but he thinks she would have tried to write back if she received his letters.  He does not know for certain

---

[6]See ConnectNetwork GTL, Connect to your incarcerated loved one, https://web.connectnetwork.com/ (accessed Oct. 28, 2019 and Jan. 7, 2020).

whether Milestone or his sister tried to reply by mail and had
their responses returned, since he has not received, and is not
entitled to receive, any notice that any personal letters
addressed to him have been sent back.  Larkin testified that he
has not written any other personal, non-privileged letters since
becoming an SCDOC inmate, and there is no evidence that anyone
else has sought, or would seek, to send him a letter that he
would have received, but for the personal letter ban.


C.   SCDOC Policies Regarding Newspapers and Magazines

Larkin testified that he does not subscribe to any
magazines or newspapers, and that he is aware of no periodicals
anyone has tried to send him that he has not received.  Because
he reports he has not seen a newspaper since his arrival at the
SCDOC, Larkin testified he remains concerned that there are
restrictions on inmate access to such publications that may
impinge on the First Amendment rights of inmates and others.
The parties stipulated, however, that SCDOC inmates are allowed
to receive print periodicals by subscription, if the publisher
mails the periodical directly to the inmate.  Stip. ¶ 6 (Doc.
No. 50); see also Inmate Handbook, Printed Materials and
Publications ¶ 1, at 18.  Capt. Hayden testified credibly that
the "publisher-only" policy applies to both newspapers and
magazines.

Capt. Hayden was asked to testify about the reason for the publisher-only rule.  He testified that it is possible for people outside the facility to handle and put contraband on or between the pages of books and periodicals sent from sources including bookstores or newsstands if they want to smuggle drugs into the facility.  Accordingly, the SCDOC's policy allows inmates to receive print periodicals only directly from the publisher by subscription, and not from bookstores or other third party sources to reduce the risk that the package or periodical could be altered by those who might seek to use it as a means of concealing contraband.

Periodicals including newspapers and magazines addressed to inmates are subject to screening for safety and security concerns.  See Inmate Handbook, at 18, Printed Materials and Publications ¶¶ 7, 9.  When a publication is rejected for having unacceptable content, the inmate receives a "Rejected Publication Form," and the publication may be destroyed.  Id. ¶ 9; see also Stip. ¶ 6 (Doc. No. 50).

## Discussion

I.   Standing

As a preliminary matter, this court notes that Larkin's arguments regarding the pertinent SCDOC policies frequently focus on the rights of unspecified inmates and others outside

12

the facility who might want to exchange mail.  His invocation of third party interests raise a substantial question about standing.  "'Standing is a threshold issue in every federal case.' It bears directly upon a court's power to adjudicate a dispute." IMS Health, Inc. v. Ayotte, 550 F.3d 42, 48 (1st Cir. 2008) (citation omitted), abrogated in part on other grounds by Sorrell v. IMS Health Inc., 564 U.S. 552, 562 (2011).

"Due to prudential limitations on standing, a party, under ordinary circumstances, may not assert the First Amendment rights of a third party." Coggeshall v. Mass. Bd. of Registration of Psychologists, 604 F.3d 658, 666 (1st Cir. 2010); see also Sessions v. Morales-Santana, 137 S. Ct. 1678, 1689 (2017) ("[o]rdinarily, a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties," but the Court "recognize[s] an exception where . . . the party asserting the right has a close relationship with the person who possesses the right and there is a hindrance to the possessor's ability to protect his own interests" (internal quotation marks, alterations, and citations omitted)); IMS Health Inc., 550 F.3d at 49 (noting that third party at issue must also have suffered an injury in fact).

The record lacks evidence that other inmates or people outside whose rights Larkin invokes are hindered in their ability to exercise their own rights, and/or, in general, that

13

they have the requisite close relationship with Larkin that
would allow him to assert their claims.  Accordingly, the court
focuses on the claims plaintiff raises on his own behalf,
arising from injuries he claims to have suffered that are
redressable and fairly traceable to defendants' conduct, and not
the claims he would seek to invoke on behalf of third parties
who are free to litigate their own claims.

## II.  Preliminary Injunction Standard

"'A plaintiff seeking a preliminary injunction must
establish that he is likely to succeed on the merits, that he is
likely to suffer irreparable harm in the absence of preliminary
relief, that the balance of equities tips in his favor, and that
an injunction is in the public interest.'"  Glossip v. Gross,
135 S. Ct. 2726, 2736 (2015) (citation omitted).  The likelihood
of success and irreparable harm are the factors that weigh most
heavily in the analysis.  See Esso Std. Oil Co. v. Monroig-
Zayas, 445 F.3d 13, 18 (1st Cir. 2006); see also Voice of the
Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32
(1st Cir. 2011).  The burden of proof is on the movant.  See
Esso Std. Oil Co., 445 F.3d at 18.

## III.  Claim 1:  Limitations on Access to Printed Periodicals

### A.  Likelihood of Success

14

In Claim 1, Larkin claims that there are unconstitutional limitations on his ability to receive newspapers or magazines. Larkin testified that he has not seen any newspapers at the SCDOC and surmises they are banned.  Capt. Hayden testified, however, that newspapers and magazines may be delivered through the mail and received by inmates who are subscribers if those print publications are sent to them directly by the publisher. His testimony in that regard is credible, consistent with the Inmate Handbook, and not undermined by the fact that Larkin has not seen any newspapers in the facility.

Larkin has not subscribed to any newspapers or other print periodicals while at the SCDOC.  Larkin has testified he is not aware of anyone having attempted to send him newspapers or magazines, who has been blocked from doing so.  Under such circumstances, Larkin has failed to demonstrate that he has suffered any injury relating to the publishers-only rule concerning periodicals.  Nothing before this court suggests that any third parties who might want to send such periodicals to SCDOC inmates, or any other inmates who have had their access to periodicals limited by SCDOC policies, cannot assert claims challenging that rule on their own behalf, that Larkin has a close relationship with those third parties, or that Larkin is otherwise properly deemed to be able to raise their claims in this case.  Therefore, because of the lack of evidence that he

15

has been injured by the publishers-only rule, Larkin has not demonstrated that there is a likelihood he will prevail on the merits of Claim 1.[7]

### B.    Irreparable Harm

"Irreparable harm most often exists where a party has no adequate remedy at law." Charlesbank Equity Fund II, Ltd.

---

[7]Even if the court were to find that Larkin had suffered an injury traceable to the publishers-only rule, the record would support the finding that he has not demonstrated the requisite likelihood of success on the merits.  The court heard testimony that the rule reduces the demonstrated risk of contraband coming in through periodicals sent to inmates from sources other than the publisher; the policy appears to be reasonably related to the facility's legitimate purpose in controlling that risk, when the Turner factors relevant to that inquiry are considered, cf. Overton v. Bazzetta, 539 US 126, 132 (2003) (citing Turner v. Safley, 482 U.S. 78, 89-91 (1987)); and Larkin has not demonstrated that the publishers-only rule is an exaggerated response to the facility's legitimate concerns.  Similar publishers-only rules have survived First Amendment challenges. See, e.g., Bell v. Wolfish, 441 U.S. 520, 549-50 (1979) (upholding "publishers-only" rule restricting detainees from receiving hardcover books from publishers, book clubs, and bookstores); Lindell v. Frank, 377 F.3d 655, 658 (7th Cir. 2004) (citing cases extending Bell)); Kines v. Day, 754 F.2d 28, 30 (1st Cir. 1985) (publishers-only rule (allowing access to books and newspapers from sources including the publisher, bookstores, book clubs, and news stores) was reasonably related to prison's interest in "security"; see also Stow v. Warden, No. 93-1869, 21 F.3d 420, 1994 U.S. App. LEXIS 5968, at *9, 1994 WL 108929, at *3 (1st Cir. Mar. 31, 1994) (unpublished table decision) (publishers-only rule that applied to all printed publications was not clearly unconstitutional); Avery v. Powell, 806 F. Supp. 7, 8-9 (D.N.H. 1992) (upholding publishers-only rule that prohibits inmates from receiving books, magazines, and newspapers unless they have been sent by direct subscription from a bona fide publisher or bookstore).

P'ship v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

"A finding of irreparable harm must be grounded on something
more than conjecture, surmise, or a party's unsubstantiated
fears of what the future may have in store." Id. Where Larkin
has not offered any evidence indicating that he has attempted to
subscribe or would otherwise be able to obtain print copies of
newspapers or magazines but for the publishers only rule, there
is no evidence in the record at this stage of the case that
would support a finding that the continued implementation of
SCDOC policies concerning newspapers and magazines would likely
cause irreparable harm to Larkin if the court does not issue the
requested injunction. Accordingly, the district judge should
deny the plaintiff's motion for a preliminary injunction
relating to Claim 1.

IV. Claim 2(a): Personal Letter Ban and *Turner* Test

    A. Likelihood of Success

Larkin asserts in Claim 2(a) that the personal letter ban
violates his First Amendment right to receive incoming mail, and
also affects the rights of others, like Milestone and his
sister, to whom he has sent letters and who he believes would
otherwise mail him a letter. Assuming, without deciding, that
the evidence about Larkin's efforts to contact those third
parties could suffice to demonstrate that he has suffered an

17

injury relating to the personal letter ban, this court turns to whether Larkin has demonstrated any likelihood of succeeding on the merits of Claim 2(a).

Although inmates have a First Amendment right to receive incoming mail while incarcerated, jails and detention facilities like the SCDOC may enact policies that restrict inmate access to incoming mail for legitimate penological purposes.  See Pell v. Procunier, 417 U.S. 817, 822-24 (1974).  In evaluating whether or not a particular prison policy is reasonably related to a legitimate penological interest, the court considers the so-called Turner factors: (1) whether the regulation has a "valid, rational connection" to a legitimate penological objective; (2) "whether alternative means are open to inmates to exercise the asserted right"; (3) "what impact an accommodation of the right would have on guards and inmates and prison resources"; and (4) "whether there are 'ready alternatives' to the regulation." Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (quoting Turner v. Safley, 482 U.S. 78, 89-91 (1987)).  Courts considering claims challenging prison policies on First Amendment grounds must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132.  "The burden . . . is not on the State

18

to prove the validity of prison regulations but on the prisoner
to disprove it." Id. (citations omitted).[8]

      1.   Rational Relationship

---

[8]Plaintiff cites Palmigiano v. Travisono, 317 F. Supp. 776,
788 (D.R.I. 1970), in support of his arguments for a preliminary
injunction.  Palmigiano is inapposite as the prison policy there
involved opening envelopes and looking at the stationery to
detect drugs, including LSD which could be sprayed on paper.
Unlike the evidence before this court, the evidence in
Palmigiano showed that stains on the paper could reveal LSD's
presence; that court's preliminary injunction allowed the visual
inspection policy to continue to be implemented.  The record
here, however, shows that drug-coated papers or drug-
contaminated inks can be applied in a way that avoids detection
by a visual screen.  Furthermore, the court in Palmigiano, in
1970, applied outdated and abrogated or overruled cases in
allocating the burden of proof and subjecting that visual screen
policy to heightened scrutiny.  Compare Palmigiano, 317 F. Supp.
at 788 ("in taking steps to prevent the introduction of
[contraband] into the prison, even though the purpose or end in
view is legitimate, prison officials must use means which are
legitimate and which provide the least restrictive of the
alternative methods of accomplishing the desired end"), with
Thornburgh v. Abbott, 490 U.S. 401, 419 (1989) ("when prison
officials are able to demonstrate that they have rejected a less
restrictive alternative because of reasonably founded fears that
it will lead to greater harm, they succeed in demonstrating that
the alternative they in fact selected was not an 'exaggerated
response' under Turner").  Plaintiff's reliance on other cases
that have been limited by Turner such as Procunier v. Martinez,
416 U.S. 396 (1974), is similarly misplaced.  Martinez's
relevance to an inmate's First Amendment mail claim has been
"limited to regulations concerning outgoing correspondence,"
Thornburgh, 490 U.S. at 413; the parts of Martinez cited by the
Sixth Circuit in Martin v. Kelley, 803 F.2d 236 (6th Cir. 1986),
regarding the First Amendment and incoming mail policies, have
been overruled.  Similarly, Staples v. N.H. State Prison, No.
14-cv-473-LM, 2015 DNH 132, 2015 WL 4067139, 2015 U.S. Dist.
LEXIS 86627 (D.N.H. July 2, 2015), cited by plaintiff, involved
inapposite "RLUIPA" claims and not the type of First and
Fourteenth Amendment claims at issue in this case.

The first pertinent factor under Turner is whether there is a legitimate purpose that is rationally related to the policy at issue.  Preventing the introduction of contraband in general and restricting inmate access to opioids like Suboxone and fentanyl in particular are legitimate penological interests.  See Lee v. Md. Div. of Corr., No. CV CCB-16-439, 2017 U.S. Dist. LEXIS 25173, at *12, 2017 WL 713760, at *5 (D. Md. Feb. 22, 2017); Covell v. Arpaio, 662 F. Supp. 2d 1146, 1153-55 (D. Ariz. 2009). SCDOC officers testified credibly that prior to the enactment of the policies described above, the facility had suffered an influx of illegal drugs which their investigations disclosed had come in through mail addressed to inmates.  Despite the SCDOC's visual screening process, inmates were still able to receive mail that contained concealed drugs.  This posed a direct risk of harm to inmates and SCDOC staff.  The SCDOC policy of generally prohibiting inmate from receiving incoming personal letters and cards is rationally related to the legitimate goal of stopping the introduction of contraband to the SCDOC through the mail.  The first Turner factor favors a finding that the policies at issue are valid.

### 2.    Existence of Alternate Means to Exercise Right

The second Turner factor is whether the SCDOC provides inmates with an alternate means of exercising their rights.  The

Inmate Handbook states that inmates may receive visits and phone calls, and the SCDOC provides inmates with tablets that they can use to communicate in writing electronically with friends and family outside of the facility, generally at no greater cost than a First Class letter; such communications may include digital images, meaning that someone setting up an account for an inmate could type a message or handwrite a letter or draw a picture, and then send an image to the inmate.  In addition, the court heard testimony that members of the public are made aware of the pertinent SCDOC policies by various means, including the facility's website; inmates' ability to provide information to friends, family, and other correspondents through phone calls and letters; and, when the SCDOC rejects a piece of incoming personal mail, a statement on the outside of the envelope indicating that the item has been returned because personal letters are no longer allowed.

The court also heard testimony and observed that it is relatively simple to use the links on the SCDOC website to set up an account to begin the process of exchanging emails or messages with inmates, provided that the person who wants to contact the inmate knows that the individual is at the SCDOC; has access to the Internet; and holds a debit card, a credit card, or a prepaid cash card.  Once an account is set up, the inmate can receive emails or messages up to three times a day,

seven days a week.  In addition, incoming and outgoing messages
remain accessible to the inmate over time through the tablet's
connection to the inmate's account.  And such messages can be in
the form of digital images, which would allow the sender to
handwrite a letter or draw a picture and then send the image to
the inmate through his or her tablet.  Inmates are thus provided
with alternative means to exercise their right to receive
correspondence, and the second Turner factor, therefore, weighs
in favor of finding the mail policy to be valid.

### 3.   Impact of Accommodation and Ready Alternatives

Larkin offered two alternatives that he asserts could
replace the SCDOC's present policy of banning most inmates'
receipt of personal letters, which he asserts would have less
impact on the First Amendment rights of inmates to receive mail:
(1) subjecting all mail to visual and physical screening for
drugs and then delivering the letters that do not appear to
include contraband to the inmates; and (2) subjecting all
incoming mail to the same copy and shred procedure that is
applied to privileged mail and ICE detainee letters.  As to
visual screening, the record supports a finding that the SCDOC
previously implemented that practice, but that it failed to
adequately limit the influx of hazardous, concealed drugs, and
was thus rejected by the SCDOC is insufficiently protective of

the facility's health, safety, and security interests.  "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under Turner."  Thornburgh v. Abbott, 490 U.S. 401, 419 (1989).

As to the alternative of employing the copy and shred procedure for all incoming mail, the record provides a rationale for the facility's decision not to do so.  Supt. Brackett testified that treating all personal mail like the letters addressed to ICE detainees would impose resource demands (and concomitant trade-offs in staff allocations) exceeding those needed for ICE detainee mail, since there are more than three times as many inmates in the general population as there are ICE detainees.  Further, the copy and shred procedure, while eliminating the risk that inmates will receive contraband through incoming mail, presents a risk of exposing facility staff to contaminants that is not present when incoming mail is simply rejected unopened and returned to the sender.  Moreover, the contractual requirement that ICE detainees be provided with incoming mail does not apply to other SCDOC inmates, which justifies the decision to allocate resources on the "copy and shred" process for ICE detainees' incoming mail without spending

23

those resources on other SCDOC inmates' incoming mail.

      This court heard testimony that undermines the force of the
argument that copy-and-shred procedures would be substantially
more resource intensive or more hazardous to inmates and staff
than the personal letter ban.  Specifically, Supt. Brackett
testified that the facility does not receive as many personal
letters addressed to inmates as it used to, and he further
testified that the SCDOC staff who handle incoming mail wear
vinyl gloves in doing so, to reduce their individual risk of
exposure.  But absent additional evidence about precisely how
much (or little) incoming mail still arrives daily at the SCDOC,
how much staff and facility resources would in fact be needed to
apply the copy-and-shred practice to all letters, and the extent
to which the personal letter ban avoids other potential health
risks – such as staff and inmate exposure to airborne
particulates released when mail is shredded – the record at this
stage of the case supports a finding that there are articulable
resource demands and health risks associated with implementing
the copy-and-shred procedures for all personal mail which the
mail ban avoids.  As this court must defer to prison
administrators' professional judgment in determining the most
appropriate means to accomplish their safety and security goals,
this court concludes that the mere existence of the copy-and-
shred procedure as an alternative to the mail ban, under the

circumstances, does not warrant a finding that the mail ban is
an exaggerated response to the facility's legitimate goals.

### 4.   Outcome of *Turner* Analysis

Taken together, and considered in light of the deference
due to prison administrators in managing matters within their
areas of professional judgment, the factors pertinent to the
court's Turner analysis, with regard to the SCDOC mail ban,
indicate at this stage of the case that the facility's policy is
reasonably related to the facility's legitimate health, safety,
and security interests, and that, when coupled with the
availability of tablet-based electronic communications, Larkin
has not demonstrated that the mail ban is an exaggerated
response to those interests.   Accordingly, Larkin has failed to
demonstrate that he is likely to succeed on his First Amendment
claim (Claim 2(a)) challenging the SCDOC's general ban on
incoming personal letters.

### B.   Irreparable Harm

The evidence before this court relating to irreparable harm
as to the personal letter ban includes evidence that Larkin used
two old addresses to correspond with a sister in Maine with whom
he has not spoken in thirty years, and then received no
response.   Although the court does not question Larkin's

testimony that his sister would have written back to him if she had received his letters, nothing more than conjecture or speculation would allow this court to find that Larkin's sister in fact received his letters or that she otherwise knows of his present incarceration, as he is not sure if the addresses he used are current, and he is not in contact with other family members or friends who might be able to put them in touch. Larkin further testified that his letters told his sister how to set up an account to contact him electronically, which she evidently failed to do.  But the weight of evidence before the court indicates she likely could do so any time.[9]  Larkin is free to send her more letters, and in the event his addresses are not current but a forwarding address for her remains on file with the U.S. Postal Service, Larkin could potentially petition the Superintendent for a limited exception to the letter ban, allowing him to receive notice if his outgoing letters are

---

[9]The foundation for Larkin's testimony that his sister doesn't have the money to set up an account appears shaky, as Larkin testified he has not spoken with her in thirty years, and he does not presently correspond with other members of his family.  Moreover, his sister if impoverished could have the capacity to send him an electronic message, if she has the money to purchase stamps.  The court heard testimony that Walmart sells prepaid cash cards that can be used to fund an account.  A sender could limit her initial deposit to the cost of a First Class stamp.  And the types of devices that can connect the sender to an inmate with a tablet over the Internet include smartphones as well as computers with access the Internet, that are "widely available in homes, schools, and libraries across the country," Ashcroft v. ACLU, 535 U.S. 564, 567 (2002).

returned to the SCDOC with a label indicating that they were
undeliverable, or perhaps providing a forwarding address.  Upon
the record before this court at this time, Larkin has not
demonstrated that an injunction is necessary to avoid
irreparable harm while this case remains pending, with respect
to his desire to correspond with his sister.

Larkin has also failed to demonstrate that an injunction is
necessary to prevent irreparable harm with respect to his
correspondence with Milestone.  The record shows that Larkin's
letter told Milestone he would not be able to receive a reply by
mail, but he did not tell Milestone that he could receive
messages electronically.  Larkin retains the ability to write
back to Milestone to let that agency known how to contact him
through his tablet.  Furthermore, Supt. Brackett testified
credibly that Larkin may rely on the assistance of case managers
at the SCDOC if he needs help communicating with organizations
like Milestone that may provide him with court-ordered services
upon his release from the SCDOC.  Supt. Brackett testified that
helping Larkin contact Milestone would be the type of assistance
case managers should provide.  See Inmate Handbook, at 29, Aid
to Departing Inmates ¶¶ 1-4.  Larkin retains the ability to send
another letter to Milestone or others, using the stamped
envelopes he receives each week, specifically describing his
ability to receive electronic messages through his tablet, if

the recipient wants to set up an account for him online.  And
Larkin can rely on the Superintendent's representation and the
pertinent part of the Inmate Handbook, if he were interested in
communicating with Milestone or any other similar service
provider as his release date approaches, in addition to or in
lieu of asking that provider to establish an account online to
communicate with him electronically.

Finally, the Inmate Handbook indicates that Larkin may
petition the Superintendent for an exemption from the personal
letter ban.  The Handbook states that the Superintendent may
allow some inmates to receive incoming mail if there are
extenuating circumstances.  See Inmate Handbook, Incoming Mail
¶ 1, at 16.  Larkin remains free to seek such relief as
appropriate with respect to those with whom he seeks to
correspond.

Under such circumstances, Larkin has failed to carry his
burden of showing that he is likely to suffer any irreparable
harm unless the court enjoins the implementation of the personal
letter ban as to Larkin.  Accordingly, the district judge should
deny the requested injunction, with respect to Claim 2(a).


V.   Claim 3:  Fourteenth Amendment

A party moving for a preliminary injunction must show that
injunctive relief is necessary to avoid irreparable harm.  In

Claim 3, Larkin asserts that since becoming an SCDOC inmate, he has received no notice that any letters addressed to him have been returned, and, citing cases including Procunier v. Martinez, 416 U.S. 396 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989), he claims that the policy of returning personal mail to the sender, without first providing the inmate and the sender with particularized notice and an opportunity to contest the rejection, violates the Fourteenth Amendment Due Process Clause.

Larkin does not have standing to litigate the claims of those who would send him letters, as nothing before the court suggests that they would be hindered from litigating their own claims. Assuming without deciding that Larkin has standing to challenge the lack of particularized notice and an opportunity for him to object before a particular letter is returned, this court turns to whether an injunction requiring the SCDOC to provide Larkin with additional safeguards is necessary to avoid irreparable harm to him, while this case remains pending.

Larkin received a copy of the Inmate Handbook after he arrived at the SCDOC, and the Handbook notified him that all personal, non-privileged letters, cards, and postcards would be returned unopened to the sender. To that extent, Larkin has had notice of the policy of returning such letters.

Larkin continues to have the ability to tell anyone with

whom he would like to correspond, for whom he has an address, that he can receive electronic messages but not personal mail at the SCDOC.  The pertinent SCDOC policies are published on the facility's website, and people who send letters to Larkin will also receive direct notice of the personal letter ban to the extent their mail is returned, and they may obtain additional information about the way they can resend the same letter electronically, after setting up the necessary account, using the hyperlinks on the SCDOC website and a suitable method of payment.

The Inmate Handbook provides that inmates may petition the Superintendent for an exemption from the personal letter ban, which the Superintendent may grant if there are extenuating circumstances.  See Inmate Handbook, Incoming Mail ¶ 1, at 16. The record does not show, however, that Larkin has taken any steps to ask for such an exemption as to any particular letters he might receive, including, for example, any letters he sends out that might be returned to him as undeliverable, from which he might obtain information regarding whether his addresses for his sister are current.  As Larkin has testified that he has not sent out any personal letters except for those sent to Milestone and his sister since his arrival at the SCDOC, and there is no evidence suggesting he intends to send letters to any other individuals or agencies whose replies would be subject to the

mail ban, there is no evidence that any additional procedural safeguards, going forward, would make a difference in Larkin's case.  There is no evidence that Milestone, his sister in Maine, or any other potential correspondent is presently seeking or plans to seek to contact him through the mail.

Finally, there is no evidence that the mail ban has ever been misapplied with respect to any letters addressed to Larkin that would otherwise be exempt; indeed, there is no evidence that any letters have arrived at the facility addressed to Larkin, which have been returned.  Absent evidence of the potential misapplication of the policy resulting in, for example, the improper designation and return of privileged mail or periodicals sourced from the publisher, this court finds that Larkin has not shown he is likely to suffer irreparable harm for the lack of additional procedural protections, while this lawsuit remains pending.  Therefore, Larkin has not carried his burden of showing that an injunction is necessary to avoid irreparable harm to him, relating to the absence of additional notice and an opportunity to be heard when letters are returned to the sender pursuant to the personal letter ban.  Accordingly, the district judge should deny, without prejudice, the motion for a preliminary injunction in connection with Claim 3.  Such a denial without prejudice would not prevent Larkin from filing a similar motion again in this case if he can produce new evidence

showing that an injunction mandating additional procedural

safeguards is necessary to avoid irreparable harm to him.[10]

---

[10]"'[P]erhaps the single most important prerequisite for the
issuance of a preliminary injunction is a demonstration that if
it is not granted the applicant is likely to suffer irreparable
harm before a decision on the merits can be rendered.'" Voice
of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d
26, 32 (1st Cir. 2011) (quoting 11A Charles Alan Wright, Arthur
Miller & Mary Kay Kane, Federal Practice and Procedure § 2948
(2d ed. 1995)).  As Larkin has failed to show such irreparable
harm, this court need not address at the time whether Larkin has
satisfied the other factors pertinent to obtaining a preliminary
injunction.  This court notes, in that regard, that Larkin has
moved for specific, prior notice of the impending return of his
personal mail, and an opportunity to object to an impending
return.  "The Supreme Court has held," however, "that minimal
procedural protections must be provided when a prisoner's mail
is not delivered, but the Court has not held that those minimal
procedural protections must include prior notice.  Notice after
the fact can be sufficient . . . ." Novosel v. Wrenn, No. 10-
CV-165-PB, 2011 WL 2633026, at *10, 2011 U.S. Dist. LEXIS 39174,
at *32-*33 (D.N.H. Feb. 16, 2011) (citing cases) (emphasis
added), R&R approved, 2011 WL 2622401, 2011 U.S. Dist. LEXIS
72054 (D.N.H. July 1, 2011).  See also Human Rts. Def. Ctr. V.
Baxter Cnty., 360 F. Supp. 3d 870, 877 (W.D. Ark. 2019) ("Since
[Martinez], appellate courts around the country have concluded
that a certain level of due process 'must accompany various
decisions to exclude prison mailings'" (citing Martinez, 416
U.S. at 408-09, and quoting Prison Legal News v. Livingston, 683
F.3d 201, 222 (5th Cir. 2012) (noting that the Fourth, Ninth,
Tenth, and Eleventh Circuits have extended Martinez's due
process requirements to other types of rejected mail), appeal
filed, No. 19-2096 (8th Cir. May 29, 2019).  See generally Starr
v. Knierman, 474 F. App'x 785, 786 (1st Cir. 2012) (per curiam)
(applying factors set forth in Mathews v. Eldridge, 424 U.S.
319, 335 (1976), in evaluating claims of procedural due process
violations relating to rejection of inmate's mail based on
clear-cut or content-neutral criteria, where procedural
safeguards were given to sender and/or inmate when mail was
rejected).  Cf. Soto v. Brock, No. 18-40568, 2019 U.S. App.
LEXIS 34745, at *9, 2019 WL 6208667, at *4 (5th Cir. Nov. 20,
2019) (per curiam) (holding that it is clearly established that
"failing to provide adequate notice and an opportunity to appeal

**Conclusion**

For the foregoing reasons, Larkin's motion for a preliminary injunction (Doc. No. 12) should be denied.  That denial, as to his motion for a preliminary injunction mandating additional procedural protections when his mail is returned, should be without prejudice to Larkin's ability to refile a similar motion if new evidence shows that injunctive relief is necessary to avoid irreparable harm, going forward, with respect to letters that would be sent to Larkin and returned without notice while this lawsuit is pending, and Larkin can satisfy the other prerequisites to obtaining preliminary injunctive relief.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

January 13, 2020

cc:  Michael L. Larkin, pro se
     Christine Friedman, Esq.

---

after rejecting a letter sent to a minor detained in a boot camp would violate the sender's constitutional rights").